Filed 7/18/16  P. v. Campos CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B259896 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA361087) |
| v. | |
| SAUL CAMPOS, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed as modified.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Saul Campos.

Rodger P. Curnow, under appointment by the Court of Appeal, for Defendant and Appellant Pasqual Campos.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Twin brothers Saul and Pasqual Campos[1] were convicted of numerous felonies committed when they were 15 years old.  Each was sentenced to 25 years to life in state prison.  The Camposes challenge their convictions and sentences on multiple grounds.  We modify the judgment to correct the presentence custody credits but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006 and 2007, the Los Angeles Sheriff's Department conducted a wiretap investigation involving the Varrio Locos Trece gang, commonly called "Trece."  The investigation resulted in the indictment of 10 Trece members and associates, including the Camposes.  Trece members Felix Silva, Saul, and Pasqual were tried together.  The charges pertained to four separate events in late 2006 and early 2007.

A.  Lucio Amparo Incident, December 16, 2006 (Charges Against Saul and Pasqual)

In a December 13, 2006 telephone call monitored by the Los Angeles County Sheriff's Department, Pasqual spoke with fellow Trece member Antonio Roman, Jr.  Pasqual asked Roman where "the thing" was, because he had spotted a "Leva" (a member of the rival Largo gang) near his school.  Roman said he had it with him, and Pasqual instructed him to bring it to him quickly because "we got a new fool too."  Based on this call, law enforcement believed that the speakers were about to transfer or transport a weapon, and additional officers traveled to the area.  When Pasqual and Roman spoke again a few minutes later, Roman explained that he was still at home because the police were in the area.  Pasqual expressed frustration because the Leva was "set up in target," and told Roman to contact him when he was leaving.

On December 15, 2006, at 9:35 p.m., Roman told an unidentified speaker that he was with "the twins."  Roman advised the other person to call if he saw suspicious cars.  At 10:04 p.m., Pasqual told Roman that he had spotted a "Leva," and said, "if you all don't mind slugging on a hina."  "Slugging" was a common term for shooting, and "hina"

---

[1]    Because Saul and Pasqual share the same surname, they will be referred to by first name for clarity.

referred to a woman. One minute later, Pasqual gave Roman the location, and said, "if you all don't mind shooting a hina, she's with him." Only a few seconds later, Pasqual, Roman, and Saul spoke. Roman and Saul were having difficulties, and Pasqual gave directions where to go to find their target, "the slipping fool with his h[i]na just posted in front"; that is, the rival gang member not paying attention with a woman standing out in front.

At 10:07 p.m., Silva gave Saul directions to the target, who was "right there outside with a hina." Silva told Saul to tell him "if you guys are going" so that he could "get behind" them, at which point Saul responded that Silva should "come back fool, you explain better[,] nigga." Silva said, "You ain't gonna do it, huh[?] [All ]right, fuck it[,] don't do it then[,] man, fuck it then." Saul answered, "Just come over here[,] fool[,] so we can do [it]." At 10:46 p.m., Roman told a man known only as Padilla that he was with "the little twin," Pasqual. Padilla cautioned Roman to be careful.

Lucio Amparo was affiliated with a gang known as Tortilla Flats. He and Roman were neighbors and enemies. They had been in multiple fistfights, and Amparo believed Roman had shot at him in the past. At approximately 11:15 p.m. on December 15, 2006, Amparo was walking outside when he saw a white Ford F-150 behind him. Amparo recognized Roman in the passenger seat but could not see the driver clearly. As the truck passed alongside Amparo, Roman said, "Fuck you," and shot five times. Amparo was struck by one bullet.

In a telephone conversation shortly after the shooting, Roman spoke with Trece associate Carlos Arellano, who told Roman that police were in the area looking for him. Arellano said that he had heard that Roman went to do a "mission" (gang business), and asked if there had been a shooting. Roman asked if Arellano had seen an ambulance; Arellano responded that he had seen a lot of police. The following day, Silva asked Roman, "Who was that dude yesterday?" Roman told Silva that he was from Tortilla Flats, and that he (Roman) had had "serious problems" with him.

3

Based on this incident, Saul and Pasqual were convicted of conspiracy to commit murder (Pen. Code,[2] §§ 182, subd. (a)(1), 187) (count 1), with the special allegation found true that the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)); and active participation in a criminal street gang (§ 186.22, subd. (a)) (count 3).

B. Lucien Street Incident, December 17, 2006 (Charges Against Pasqual)

At 9:41 p.m. on December 17, 2006, Pasqual asked Roman to get a nine-millimeter gun and go outside. Roman agreed to wait outside his house for the gun to be picked up. A few minutes later, Pasqual warned Roman that police were in the area; Pasqual instructed Roman to wait out front and said he would tell the others to go to Roman's house.

Approximately 15 minutes later, Pasqual asked Arellano for "the thing" because they needed it "right now." They discussed where the item was and how to access it. At 10:10 p.m., Pasqual told Roman to go outside because "the homies" were out in front. At 10:12 p.m., Pasqual checked with Roman that the men had come and gone and asked, "They took it, right?"

At 10:15 p.m., deputy sheriffs on patrol in the area saw a dark blue Ford Excursion with a driver and a passenger who appeared to be gang members. When they began to follow the Excursion, the driver sped off, then slowed enough for the passenger, later determined to be Trece member Jesus Garcia, to exit the car with a gun. The officers apprehended Garcia and recovered a .40-caliber semi-automatic firearm with 10 rounds in its magazine. Other officers stopped the Excursion on Lucien Street and detained its driver, Trece member and shot caller Ivan Lozano.

The next morning, Lozano said they had been "on" the night before but that they were unable to shoot anyone. Lozano had meant to "dump on them nigga right there." "Dumping" was a gang term for shooting. Lozano said he had planned to "tag" (shoot) the people and to "go around . . . then hit the niggas" but then the police appeared.

---

**2** Unless otherwise indicated, all further statutory references are to the Penal Code.

4

Garcia jumped from the car and Lozano told him to get rid of his weapon. The police caught Garcia with a "Whoadie," a .40-caliber gun. Lozano said he had been able to escape initially but was apprehended when he returned to try to find Garcia.

On December 18, Lozano and Trece member Anthony Rivera discussed the need to "close shop" and postpone gun-related activities due to the presence of federal agents in the area. Lozano told Rivera they had lost the Whoadie and remarked, "We are bringing heat to the hood like a mother fucker." At the close of the conversation, Lozano instructed Rivera to tell "the homies" that the neighborhood was "super hot," meaning that the police were around.

A firearms expert determined that the gun recovered in this incident matched expended bullet casings that had been recovered after Amparo was shot.

Based on this incident, Pasqual was charged with conspiracy to commit murder (count 5), with a gang enhancement under section 186.22, subd. (b)(1)(C); and active participation in a criminal street gang (count 7). Pasqual was convicted on count 5 of the lesser offense of conspiracy to commit assault with a semi-automatic firearm (§§ 182, subd. (a)(1), 245, subd. (b)), with the gang enhancement found true; and he was convicted as charged on count 7. Saul was not charged with respect to this incident.

C. Ladybug Incident, January 19, 2007 (Charges Against Pasqual)

On January 19, 2007, at 7:11 p.m., Roman spoke with Trece member Jose Rodriguez. Roman told Rodriguez that Ladybugs—members of a rival gang—were around. Ten minutes later, Saul and Roman discussed getting a car and a "thing." At 7:51 p.m. Rivera and his brother, also a Trece member, discussed the need to have an item picked up for an unidentified third person who said that rival gang members are passing through the area and who wanted to "take them fools." They talked about arrangements to pick up something so that "the little homies" can "[h]andle what they gotta handle."

A flurry of calls followed. Rivera talked to an unknown man at 7:55 p.m. about meeting plans to pick "it" up; Rivera advised the other speaker that the "homie's gonna

5

need that right now." At 8:32 p.m., another unidentified speaker told Rivera that Trece member Raul Soltero had the item but that it needed shells, meaning casings or bullets. Rivera said that he had advised "them" that they needed to get shells. The unknown man asked, "They gonna burn it up or what?" Rivera responded, "They're gonna do something." Seconds after that call ended, Rivera told Soltero that he would try to send either Silva or the Camposes to pick up the item so that Soltero would not have to travel with it. At 8:35 p.m. Rivera sent Silva to pick it up from Soltero. In an 8:40 p.m. call, Rivera told Soltero they were driving an older white truck, and Rivera and Soltero stayed on the phone until Soltero confirmed that he saw the truck. Meanwhile, Trece members continued to search for ammunition: Saul asked Roman for shells for a "nino," a nine-millimeter handgun, and Roman said he would attempt to locate some. Rivera asked Soltero for ammunition but Soltero had none.

These conversations prompted law enforcement to send officers toward Soltero's street to intercept the white truck and disrupt the plan for Pasqual and Silva to pick up the gun from Soltero. The police spotted Silva driving his white Ford F-150 pickup truck and Pasqual in the passenger seat. When the police pulled Silva over, Pasqual jumped out of the truck and fled, throwing a blue steel handgun with an extended magazine over a fence as he ran. The police pursued Pasqual, took him into custody, and recovered the blue steel handgun.

At 9:05 p.m., Silva told Rodriguez that the police "just chased the 'Twin' right now" and probably were looking for him (Silva) too. Silva believed that they had caught Pasqual. Silva thought that the police would conduct a raid and that Rodriguez should tell everyone to leave the neighborhood. Later that night, Silva explained to Rivera that they had picked up the gun as planned but then encountered the police, and Pasqual ran. Rivera asked if the police found the weapon. Silva believed they were still searching for it.

The following morning, January 20, 2007, Pasqual spoke to several other Trece members. Pasqual told Rodriguez that he had been released and that he would search for the gun that day. Pasqual said he lost the nine-millimeter handgun that he had obtained

6

from Soltero. Pasqual said that he had been "about to go plug," meaning about to commit a shooting. They had intended to get ammunition but Silva became paranoid and panicked when the police appeared. Pasqual said Silva made him jump from the vehicle, and Rodriguez responded that it was because Pasqual had the gun. Pasqual told Rodriguez that he did not think that the police had found the gun that he tossed away.

Pasqual also reported to Roman that he had lost the gun. Pasqual explained that the police pulled them over right after he had asked Roman for the ammunition. Roman said that the police had been "hot yesterday," which meant they had a heavy presence in the area.

Later that morning, Pasqual and Rodriguez were together and spoke with Silva. Pasqual said that he knew where the gun was and that the police had not found it: "I remember w[h]ere I threw it at[,] fool[,] because it was, once the cops started chasing me I threw it and shit. I know where[,] fool. And they are stupid[,] fool. It landed right in front of their face and they didn't even see it." Pasqual cautioned Silva to stay away and to hide his truck. Silva said the police did not take down his license plate number, but Pasqual thought they might have, and Silva opined that if the police did not find the gun they would have no case against him.

Pasqual was convicted of active participation in a criminal street gang (count 13) and conspiracy to commit murder (count 11), with count 11's gang enhancement under section 186.22, subdivision (b) found true. Saul was not charged in conjunction with this incident.

D. Baby Shower Incident, February 3, 2007 (Charges Against Saul)

On February 2, 2007, at 5:16 p.m., Pasqual told Arellano that a person wearing a blue hat in a white car had shot at him and Roman. Roman then described the shooter and the car, a Honda, to Arellano. At 5:32, Pasqual described the shooting and the shooter to Saul. When they spoke again a few minutes later, Saul said that he was not going to call the police but would "handle this myself."

7

A series of phone calls followed concerning arrangements for guns and ammunition. By 5:45 p.m., Silva and an associate spoke about the shooting and discussed having "something over there" that belonged to Garcia by the next day. At 7:20 p.m., Lozano and another person discussed the shooting attempt and where the "mini," a mini assault rifle, was. At 7:53 p.m., Pasqual described the details of the shooting to Lozano, and Lozano said that he was trying to get Pasqual a weapon immediately. Pasqual said he had already borrowed one, but Lozano said that he would try to get one for him so that he did not have to borrow one. Pasqual reported that he was standing guard in the neighborhood looking for a white Honda.

Shortly before 8:00 p.m., Lozano told Rodriguez that he had all the "banana ones," meaning a long magazine called a banana clip. They discussed that Carlos Montelongo, a friendly member of the Florencia gang, had the mini-K, the mini assault rifle. Soon afterwards, Rodriguez asked Lozano if the banana clips were loaded. Lozano confirmed that they were, and told Rodriguez to see a person called Mono to get them. Lozano instructed Rodriguez to retaliate: "[T]ag them mother fuckers, fool. Don't let them niggas go on y[a'll's] block and bust on y['all]."

At 8:13 p.m., Rodriguez asked Lozano to call Mono so that Rodriguez and Montelongo could go pick up a "banana" from him. Lozano then instructed Roman to call Mono and "tell him to take out the two clips he has there for the 'mini[]'. The homies are going to pick it up right now." At 8:22 p.m., Roman said Mono would have the clips ready, and Lozano and Roman discussed sending the twins or Rodriguez to pick them up from Mono.

At 8:56, Saul told Montelongo, "Let's go cause some damage[,] fool." To "cause damage" meant to perform a gang-related shooting. Montelongo told Saul that he felt like causing some damage, and that Saul could use the nine-millimeter handgun while he would use the mini assault rifle. Montelongo said he wanted to "serve those fools," meaning to shoot them. Montelongo said he needed a stolen car, and Saul told Montelongo to "hit him up" once he had one.

Later that evening, Lozano checked in with Rodriguez. Rodriguez said he was standing guard but nothing was happening. Rodriguez mentioned that Montelongo had the mini-K. Lozano told Rodriguez that if he needed anything, or if it got "hot" where he was, he could come over.

The following evening, February 3, 2007, at 6:04 p.m., Saul told Rodriguez that Montelongo wanted a stolen vehicle, and that he and others were going to pick up Rodriguez. A minute later Saul told Rodriguez they were about to leave, and Rodriguez told them to call when they had reached a certain location. By 7:06 p.m. Saul and Rodriguez were in one vehicle, while Montelongo was in another. Saul asked Montelongo where he wanted them to "roll out," and Montelongo said that they should park on Cherry Street and wait for him because he had "the heat." At 7:12 p.m., Montelongo told Saul to leave for Cherry Street, and that he was going to "just make sure [they're] out there[,] fool[,] and we're going to roll right now." At 6:18 p.m., Montelongo told Saul where to park. At 6:19 p.m., Montelongo told either Saul or Rodriguez to come out so that they could "plan this shit out right quick."

At 8:05 p.m., Rodriguez asked Roman for the mini assault rifle, and a minute later asked a person known as "Shanky" to hold it. Rodriguez told Shanky he was with one of the twins and Montelongo.

At 8:20 p.m., Saul and Pasqual spoke. Pasqual asked Saul if he had the AK-47 assault rifle with him, and he advised Saul that if he were to get caught he should make sure that Rodriguez took the blame. At 8:39 p.m., Montelongo told Saul that if he saw "those niggers," he should shoot them, but that he should make sure no one else was around.

Later that evening, Montelongo and his girlfriend Laura Marquez picked up Saul and Rodriguez in Montelongo's van. They dropped off Saul and Rodriguez, who then stole a red car and followed Montelongo. Montelongo pointed at a house on East Bliss Street and told Marquez it was the house they were going to shoot. Marquez heard two shots. Saul and Rodriguez ran back to the van. Saul had been shot in the buttocks. Montelongo began to drive to the hospital, but he was stopped by police who were on the

9

scene because they anticipated a drive-by shooting based on the wiretapped communications. Montelongo, Marquez, Rodriguez, and Saul were in the van when it was stopped. A loaded mini-14 rifle and .223-caliber ammunition were found in the van, and there were bloodstains on the back bench seat.

Marquez told the police that the people in the van had just been involved in a drive-by shooting. She directed them to the house at 2227 East Bliss Street. Marquez told the police that Saul said that he wanted to shoot someone at that house. She said that she saw Saul, who was the passenger in the red car, shoot once at the Bliss Street residence. Marquez identified an abandoned red Honda to the police as the car that Saul and Rodriguez had used.[3] The owner of the East Bliss Street house told police that people in the red car had fired upon him and that he had fired back.

In conjunction with these events, Saul was charged with conspiracy to commit murder (count 14), active participation in a criminal street gang (count 15), and two counts of attempted murder (counts 21 and 22). Pasqual was not charged in connection with this incident.

In his opening statement, the prosecutor played recordings of six of the telephone calls intercepted by the wiretap on February 2 and 3, 2007, and he also asserted that Saul fired at least one shot and was found with gunshot residue on his hands. Later in the trial, before the presentation of evidence concerning these counts, the prosecutor advised the court that he had learned that Alfredo Vargas, the owner of the East Bliss Street home, now admitted that he had lied to the police and in prior testimony. Vargas now reported that no one had shot at his family on February 3, 2007, and that his neighbor was the one who had fired on the red car.

---

[3]    At trial, Marquez stated that she had not seen Saul shoot at anyone and that she had lied to the police. She also testified that she had lied when she told the police that Saul said he wanted to shoot someone at the East Bliss house. She stated that she had lied when she testified before the grand jury that she had seen a gun come out from the red Honda just before the shooting started. Marquez identified several other statements she had made to the police as false.

10

The prosecutor advised the court that the prosecuting attorneys believed Vargas's recantation, that it was consistent with ballistic evidence, and that it appeared that two relatives of Vargas who were potential witnesses also appeared to have lied, although they had not admitted it. The prosecutor explained that the People no longer believed that there had been any attempted murder in the Baby Shower incident and requested that the two attempted murder charges be dismissed in the interest of justice, but also declared his intent to continue to proceed on the conspiracy to commit murder charge, count 14.

Saul's counsel moved for a mistrial on the ground that the prosecutor's opening statement and the playing of the six telephone calls during the opening statement irrevocably prejudiced him. Silva and Pasqual joined in the motion. The trial court denied the motion but invited Saul to submit a special instruction advising the jury that although the conspiracy count remained active, any evidence of the defendants shooting would "go out because the witnesses have recanted, and the evidence supports their recantation." Saul's attorney told the court he would prepare such an instruction, but it does not appear from this record that he did so. Vargas ultimately testified that he had lied when he said that the occupants of the red car fired on him and he fired back. He claimed to have lied to protect his family from other gang members.

Saul testified in his own defense. He testified that he was not a gang member, but that Pasqual was, and that he and his twin did not get along. Saul said that Pasqual called him on February 2, 2007, in the recorded call that had been played by the prosecution, and said that someone had shot at him at their house. Saul was upset because his family lives there. He did not call the police because he did not trust them. Instead, he accepted a nine-millimeter handgun from Montelongo so that he could protect his family if the shooters returned. Saul did not know how to handle guns and had never fired one before. He returned the gun to the backyard of Montelongo's house the following day because "I was scared. I was afraid. I didn't want to hold the gun." He never intended to kill anyone.

Saul testified that on the evening of February 3, 2007, he stole a red Honda with Rodriguez for a joyride. He had been told that two cars were in the neighborhood, one of

11

which looked like the car from which the shots had been fired at the Campos residence the day before. Saul and Rodriguez looked for the two vehicles. Saul was looking for these cars because "I felt like my life was being threatened. They kept passing by my house. They kept passing all through there, you know, like they want to do something." He thought they would "probably shoot at [his] house again," and he wanted to scare them off by jumping out and possibly fighting them. He had no idea that Montelongo was looking for a gun that night. As they drove down East Bliss Street, Saul was shot. He panicked and ran away. After running some distance and hiding in a house, he waved down Montelongo's van. Rodriguez was already in the van.

Saul was convicted of conspiracy to commit murder (count 14), with the gang enhancement allegation under section 186.22, subdivision (b) found true; and two counts of active participation in a criminal street gang (counts 15 and 16).

E. Sentencing

The Camposes were sentenced together. At the sentencing hearing, held in August 2014, Pasqual presented the live statement of a teacher who had worked with him after his arrest. She spoke about the need to treat juvenile offenders differently than adult offenders; endorsed then-pending legislation concerning juvenile sentencing; requested that Pasqual be given a second chance; and emphasized his youth and immaturity at the time of the offenses.

Counsel for both brothers urged the court to impose the two 25-year-to-life sentences concurrently rather than consecutively. Counsel for Saul argued that consecutive 25-year-to-life sentences would be the functional equivalent of sentences of life in prison without parole. Pasqual's attorney reminded the court of the boys' ages at the time of the crimes, noted that new laws about parole for juveniles contemplated differentiating children of the boys' age from other defendants, and argued that the court could and should impose concurrent sentences on the two conspiracy to commit murder counts. In Pasqual's case, counsel noted, there would also be an additional sentence for

his conviction on count 5, and he asked the court to impose a total sentence of 28 years, 4 months to life in state prison for Pasqual.

The court asked the prosecutor to address the issue of the defendants' age. The prosecutor acknowledged that the defendants' age was a factor militating in favor of concurrent sentencing, but argued that all other factors supported the imposition of consecutive sentences. One of the major factors in determining whether to impose concurrent or consecutive sentences, the prosecutor observed, was whether the crimes were independent in nature. Here, there were four separate crimes over a span of some months, each with distinct victims and separate mechanisms for the crimes' execution. The threat of bodily harm was great in each incident, as both Saul and Pasqual were personally armed with firearms. They also intended to carry out drive-by shootings, crimes which leave victims particularly vulnerable.

The prosecutor argued that both Pasqual and Saul had been active participants who showed substantial planning to coordinate the intended attacks and to identify specific targets. Pasqual provided the firearm in one conspiracy, a weapon he obtained by inducing Roman to participate. In the other conspiracy, Saul had induced Montelongo to participate by suggesting they "cause some damage," and then Saul encouraged him to steal a car for their drive-by shooting. The prosecutor concluded that despite their youth, both Pasqual and Saul had shown "great sophistication and independent instances with preparation and an enormous threat of harm." Pasqual, moreover, had attempted to capitalize on his juvenile status in the course of the crimes: knowing that he was a juvenile, he took the gun and ran from an adult gang member to insulate the adult gang member from criminal liability. The prosecutor argued that these aggravating factors outweighed the Camposes' age. "They show a lot more poise, planning, and sophistication and potential for danger than other boys their age. They acted like dangerous men in these cases, not like boys."

The court asked whether consecutive sentencing would result in sentences functionally equivalent to life without parole. The prosecutor responded that the only difference between consecutive sentences in the case and a life sentence was "a 60-year-

13

old can parole." The court said it believed that consecutive sentences for the Camposes would constitute a functional equivalent of life without parole: "I don't have any choice in the matter. It's not that I want to, it's that I believe that's what the law is."

The court then sentenced Saul to two concurrent sentences of 25 years to life in state prison (counts 1 and 14). The court stayed the 10-year gang enhancement on count 1 and three high terms on counts 3, 15, and 16. The court sentenced Pasqual to two concurrent sentences of 25 years to life in state prison (counts 1 and 11), with the 10-year gang enhancement on count 1 stayed. The court imposed a concurrent high term sentence on count 5, with a mid-term sentence on the gang enhancement on that count; and imposed but stayed high term sentences on counts 3, 7, 13, and 16. The court identified six aggravating factors and one mitigating factor, the defendants' age, in selecting the high term sentences. The court awarded custody credits and imposed various fines and fees for each defendant. Both Saul and Pasqual appeal.

## DISCUSSION

### I.      Denial of Saul's Mistrial Motion

During the prosecutor's opening statement, while discussing the Baby Shower incident, the prosecutor played recordings of six telephone calls intercepted by the wiretap on February 2 and 3, 2007, and stated that Saul fired at least one shot while traveling past the Vargas residence on February 3, 2007. During the trial, before the presentation of evidence concerning the incident, the prosecutor advised the court that Vargas had recanted and now stated that no one had fired from the car. Vargas now claimed that his neighbor had fired on the red car. The prosecutor requested that the two attempted murder charges be dismissed in the interest of justice, but intended to proceed on count 14, the charge of conspiracy to commit murder.[4]

Saul moved for a mistrial on the ground that the prosecutor's assertion that he had fired a shot and the playing of the telephone calls during the opening statement

---

[4]      Count 15, active participation in a criminal street gang, also survived, although the parties do not discuss it on appeal.

14

irrevocably prejudiced him. Defense counsel argued that because the jury had been told that a shooting occurred and that Saul fired at least one round, and because the calls were played for the jury, "[t]hat evidence has been placed in front of the jury," and there was no way an instruction could cure the prejudice from the erroneous assertion that a shot was fired from the red car. Counsel argued that the jurors "are going to go back into the jury room at the end of this trial wondering what the hell happened, why this has been dismissed but remembering that the evidence is that he committed the crime." The prosecutor argued that an opening statement is not evidence and no evidence had been placed before the jury; and advised the court that the recorded telephone calls that had been played remained relevant to the charge of conspiracy to commit murder. Co-defendants Pasqual and Silva joined in the mistrial motion.

The trial court denied the motion for a mistrial but said it would be "happy to" instruct the jury with an instruction prepared by counsel stating that although the conspiracy count remained active, evidence that the defendants fired a gun would "go out because the witnesses have recanted, and the evidence supports their recantation." Saul's attorney said he would prepare a special instruction but apparently did not do so.

Saul argues that the trial court abused its discretion and denied him a fair trial when it denied his motion for a mistrial, and that his conviction on count 14 for conspiracy to commit murder therefore should be reversed. He contends that the recorded telephone calls that were played to the jury were irrelevant because Vargas recanted and counts 21 and 22 were dismissed. Saul also argues that a mistrial was required because of the prosecutor's statement that Saul fired a gun at the Vargas house. He argues that the "false impression" that Saul shot at the Vargas home, when combined with evidence presented at trial that gunshot residue was found on his hands, foreclosed the jury's consideration of Saul's defense that he had no intent to kill anyone.

The trial court did not abuse its discretion. A trial court should grant a motion for mistrial if the defendant's chances of receiving a fair trial have been irreparably damaged and the error is incurable through admonition or instruction. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1084.) When the prosecutor gave his opening statement, his assertion

15

that the evidence would show that Saul shot at the Vargas house was properly presented, as it pertained to counts 14, 15, 21, and 22. Later in the trial, before the evidence relating to the Baby Shower incident was presented to the jury, the prosecution learned that Vargas had recanted and, on the understanding that Saul had not in fact shot at the Vargas home, promptly requested the dismissal of the two attempted murder counts that pertained to the Baby Shower incident. Although the attempted murder charges relating to the Baby Shower incident were then dismissed, a charge of conspiracy to commit murder relating to that incident remained viable, and its viability did not depend on whether there was an actual shooting or attempted murder. The recorded telephone calls remained relevant to the surviving charge of conspiracy to commit murder in count 14.

To the extent that any prejudice resulted from the ultimately inaccurate statement in the opening statement that Saul had fired at least one shot, the trial court's invitation to Saul to prepare a special instruction indicates the court's implicit determination that any such prejudice could have been cured by such an instruction. Because a special instruction would have cured any potential harm from the inaccuracy in the opening statement by informing the jury that the witnesses had recanted their account that a shot was fired and that the evidence supported their recantation, Saul forfeited his claim by failing to submit a curative instruction when invited to do so. (*People v. Bennett* (2009) 45 Cal.4th 577, 611-612.)

Saul argues that if his trial counsel forfeited this issue by failing to draft a special instruction, that failure constituted ineffective assistance of counsel within the meaning of *Strickland v. Washington* (1984) 466 U.S. 668. To establish ineffective assistance of counsel, Saul must demonstrate that "(1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner." (*In re Neely* (1993) 6 Cal.4th 901, 908.) We need not consider whether counsel's performance was unreasonably deficient because Saul has not established that he was prejudiced by the failure to draft a special instruction.

16

(See *People v. Carrasco* (2014) 59 Cal.4th 924, 982.) The jury was instructed with CALCRIM Nos. 203 and 205, which identified the specific surviving charges against Saul and informed the jury that the attempted murders charged in counts 21 and 22 no longer needed to be decided. Saul has not shown that those instructions were insufficient to dispel any prejudice that arose from the representation in opening argument that Saul had fired a weapon on February 3, 2007.

Saul also contends that no admonition or instruction could have cured the prejudice arising from the opening statement because by the time the jury was required to consider count 14, the jurors had already been "tainted" by hearing in the opening statement that Saul had fired at least one shot from the vehicle. He argues that the prejudice arising from the representation in the opening statement that he had fired a weapon was compounded by the evidence presented at trial: the prosecution "further muddied the water" by presenting gunshot residue evidence at the trial that demonstrated that Saul "'could have fired a gun' on the night in question." The expert witness who performed the gunshot residue testing, however, testified that the residue could have been deposited on Saul's hands in multiple ways, such as firing a gun, handling a gun, being in close proximity to someone who fired a gun, touching a surface with gunshot residue on it, or some combination of these actions. Whether Saul actually fired a gun was not important to the prosecution's theory with respect to count 14, as the prosecutor made clear at closing: "And the fact that they didn't get to shoot because they were shot at doesn't negate why they went there, what they went there with, how much surveillance they did of this location, and that there was a specific target identified at a specific location, and that's where they were going, and that's where they went."

Saul claims that the "jury was left with the impression appellant was a dangerous person who should be convicted regardless of the facts," but he does not explain how that was so when the existence of a conspiracy to commit murder did not depend on whether Saul fired a weapon on February 3, 2007. Although Saul asserts that CALCRIM Nos. 203 and 205 were insufficient to dispel the prejudice, he has not demonstrated that these

17

instructions were inadequate to cure any prejudice arising from the opening statement in light of Vargas's mid-trial recantation.

## II.    Instructional Issues

### A. Denial of Self-Defense Instructions on Count 14

Defense counsel requested self-defense instructions as to count 14, the charge that Saul conspired to commit murder in the Baby Shower incident on February 3, 2007. Counsel argued that Saul intended to protect his family and his neighborhood from rival gang members by driving around the neighborhood to locate and drive out rival gang members who were there to find someone to shoot. Saul's counsel argued that Saul was "a 15-year-old kid who was trying to do what he could do to protect himself and his loved ones."

The prosecutor argued that the principles of self-defense did not encompass the situation in which a person drives around his neighborhood searching for someone to shoot; that would be "essentially a 'get out of jail free' card because I am in some amorphous self-defense area protecting my family; therefore, I can shoot anybody I want." The prosecutor pointed out that such a construction of self-defense would be a "really, really bad policy." The prosecutor reiterated that there was no "global self-defense as a gang member that exonerates you from future crimes and preemptive strikes against your rivals," and argued that because the two attempted murder charges in counts 21 and 22 were dismissed, self-defense instructions were not appropriate. The trial court agreed that self-defense instructions were not warranted: "To allow gang members who are engaged in a constant warfare with their rifles because of any incident to say they can then arm themselves and plan to shoot[] to remove that threat is not a self-defense argument."

Defense counsel asked the court whether the court was "talking about a policy," and the court responded that it was. Counsel acknowledged the court's concern about the message being communicated by the availability of the instruction but argued that jury instructions warranted by the evidence should not be denied as a matter of policy. The

18

trial court clarified that even in the context of "continuing warfare between gang members," self-defense could be available on appropriate facts: "Now, had somebody actually shot and may have returned fire that day because they have a fear, and you had the evidence to support it based on testimony or in this case wiretaps, I am not saying you couldn't apply self-defense to an actual shooting event. But to try to apply it to a conspiracy just doesn't wash" because it would be tantamount to giving a "get out of jail free card." "Gangs are in constant warfare with each other," the trial court noted. "[Y]ou can't create the situation to make self-defense applicable. And if you want to take it to its logic[al] conclusion, that's what gang warfare is. It's creating the thing. We're always going to be at war; we're always going to be doing acts against each other. Therefore, you don't get to use self-defense."

Saul argues that the trial court committed reversible instructional error with respect to count 14 when it declined to give instructions on self-defense and imperfect self-defense. The trial court "must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953 (*Martinez*).) That duty extends to instructions on the defendant's theory of the case, "including instructions 'as to defenses '"that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'" (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) On appeal of the denial of a jury instruction, we review the record de novo to determine whether it contains substantial evidence to warrant the rejected instruction. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584.)

Homicide is justified when it is committed in self-defense, that is, when the defendant actually and reasonably believes in the need to defend against imminent bodily injury or death. (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134; §§ 197, 198.) Imperfect self-defense arises when a defendant has an actual but unreasonable belief in the necessity to defend against the imminent danger of suffering great bodily injury or being killed. (*Elmore*, at p. 134.) Imperfect self-defense negates the element of malice.

19

(*Ibid*.) Because a conspiracy requires express malice, both perfect and imperfect self-defense appear to be a complete defense to a charge of conspiracy to commit murder. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1237; *People v. Battle* (2011) 198 Cal.App.4th 50, 75 ["a conspiracy to commit murder is always a conspiracy to commit first degree murder and provocation cannot reduce it to a conspiracy to commit second degree murder"].)

There was no substantial evidence to support self-defense instructions on count 14. Specifically, there was no evidence showing that at the time Saul conspired with his associates he reasonably and/or actually believed that he was, or that third parties were, in imminent danger of suffering great bodily injury or being killed and that he had to immediately use deadly force to defend against the danger. The evidence showed that Saul conspired to kill rival gang members on February 2 after his brother was fired upon, but that he did not go looking for rivals until the following night. He chose not to call the police after some rival gang members fired shots outside his home, saying that he would handle the situation himself instead. He handled the situation by agreeing over the phone to murder rival gang members. There was no evidence that at the time he did so Saul was in imminent danger of being shot or had any cause to believe he had an immediate need to use deadly force. He and other gang members began planning to retaliate, arranging for weapons, ammunition, and a stolen car, all of which they had acquired by the following night when they went out looking for rivals to confront or kill. This evidence is inconsistent with self-defense. "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An *imminent peril is one that, from appearances, must be instantly dealt with*." . . . [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an *actual* fear of an *imminent* harm." (*In re Christian S.* (1994) 7 Cal.4th 768, 783, italics original.) Although Saul describes himself as riding around on February 3, 2007, looking for suspicious cars, focusing

20

purely on protection, and believing that rival gang members would "probably" shoot at his house again in the future, he does not identify any evidence that he acted under the fear of imminent danger to life or great bodily injury when he entered into the conspiracy.

Saul argues that there is "no authority for denying a defendant self-defense or imperfect self-defense instruction because he is (a) a gang member and/or (b) he is a gang member caught in warfare with rival gangs." While the court did discuss the policy implications of permitting gang members to assert self-defense with respect to a conspiracy to commit murder within the context of ongoing inter-gang violence, our review is confined to the correctness of the trial court's ruling, not its reasoning. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.) Here, because there was no substantial evidence that Saul conspired to commit murder as charged in count 14 under the belief that he was in imminent danger of suffering great bodily injury or being killed and that he had to immediately use deadly force to defend against the danger, the trial court properly declined to give self-defense instructions.

### B. Denial of Requested Special Instruction That Criminal Liability Cannot be Based Solely on Membership in a Group

Pasqual requested that the trial court instruct the jury that "[c]riminal liability cannot be based solely on the membership [in] a group." The court refused to give the instruction because it was "liable to confuse the jury with how you prove membership in a gang, for what purpose you prove it, what is allowable, what is not allowable." The court said that those matters were already covered clearly by the instructions and that the proposed instruction was argumentative. Pasqual argues that the court erred when it refused to give his proposed instruction and that his convictions for active participation in a criminal street gang (counts 3, 7, 13, and 16) must be reversed as a result.[5]

---

[5]    Saul joins in Pasqual's argument and asserts that his "rights were equally affected by the trial court's decision not to instruct the jury that criminal liability cannot be based solely [on] group membership." Although Saul does not specify which of his criminal convictions he claims to have been affected by the denial of this instruction, we presume

21

While the trial court must instruct on general principles of law that are relevant to the issues raised by the evidence and necessary for the jury's understanding of the case (*Martinez, supra,* 47 Cal.4th at p. 953), the court "may refuse a proffered instruction that is incorrect, argumentative, or duplicative." (*People v. Boyce* (2014) 59 Cal.4th 672, 706.) Pasqual's proposed jury instruction was duplicative of CALCRIM No. 1400.

Although the proposed instruction referred generally to membership in a "group," the only group relevant to a violation of section 186.22, subdivision (a) is a criminal street gang. Both currently and at the time of the charged offenses section 186.22 has provided that "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." (§ 186.22, subd. (a).)

CALCRIM No. 1400 is the pattern jury instruction given when a defendant is charged with violating section 186.22. As given in this case, CALCRIM No. 1400 provides that for a defendant to be guilty of the crime of active participation in a criminal street gang, the People must prove: "1. The defendant actively participated in a criminal street gang; [¶] 2. When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 3. The defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by: [¶] a. directly and actively committing a felony offense; [¶] OR [¶] b. aiding and abetting a felony offense." Among the many definitions in the instruction is the explanation that "[a]ctive participation means involvement with a criminal street gang in a way that is more than passive or in name only." Mere presence at the scene of a crime or the failure to prevent it, the instruction

that he also challenges his convictions for active participation in a criminal street gang (counts 3, 15, and 16).

22

notes, is insufficient on its own to make a person an aider or abettor for the purposes of this offense.

CALCRIM No. 1400 instructed jurors that for Saul or Pasqual to be convicted of violating section 186.22, subdivision (a), not only did he have to actively participate in a criminal street gang with the requisite knowledge of the gang's pattern of criminal activity, but also he had to willfully assist, further, or promote felonious criminal conduct by members of the gang either by directly and actively committing a felony offense or by aiding and abetting a felony offense. This instruction accurately and thoroughly informed the jury of the legal requirements for a conviction of this offense, and it precluded the jury from finding the defendants guilty of violating section 186.22, subdivision (a) based solely on mere membership in or affiliation with a criminal street gang. The trial court did not err in refusing the proposed jury instruction.

### C. CALCRIM No. 563

Saul, joined by Pasqual, argues on appeal that as given here, the jury instruction on conspiracy, CALCRIM No. 563, removed issues from the jury's consideration and deprived the jury of its fact-finding role by declaring that the defendants committed overt acts with the intent to kill. Specifically, they argue that on count 1, one of the overt acts alleged to have been undertaken in furtherance of the conspiracy was that Pasqual and Silva searched for rival gang members "to shoot and kill," and another listed overt act alleged that Pasqual and Silva telephoned Saul and Roman and directed them to a location where they could find a rival gang member "for the purposes of killing the rival gang member." Additionally, Saul challenges the inclusion in count 14 of the alleged overt act that Saul, Rodriguez, and Montelongo drove into rival gang territory "to find rival gang members to shoot and kill." According to Saul, these passages in the jury instruction improperly instructed "the jury that defendants undertook the acts with the intent to kill."

We conclude that there is no reasonable likelihood that the jury understood CALCRIM No. 563 in the manner asserted by the Camposes. (*People v. Cole* (2004) 33

23

Cal.4th 1158, 1212.) CALCRIM No. 563 advised the jury that to prove that a defendant was guilty of conspiracy to commit murder, the People were required to prove, among other elements, that the defendant committed at least one of a list of alleged overt acts pursuant to the agreement to kill. The passages of which appellants complain were all alleged among the possible overt acts. CALCRIM No. 563 did not instruct the jury that a defendant had taken any of the actions listed or that he had any specific intent; instead, it advised the jury that for the People to prove that the charged defendant was guilty of conspiracy to commit murder, the People were required to prove that a defendant undertook one or more of those overt acts. Where, as in the examples set forth above, the overt act alleged the actor's intention, it is clear from a reading of the full jury instruction that the jury was charged with determining whether the People had proven both that the act was undertaken and that it was undertaken with the specified intent. There is no reasonable likelihood that the jurors would have understood CALCRIM No. 563 as instructing them what the actors' intents were rather than placing before them the question of whether the People had proven the acts and intents in question. Appellants have not established any error in CALCRIM No. 563 as given with respect to counts 1 and 14.

### III. Sufficiency of the Evidence

#### A. Count 1, Conspiracy to Commit Murder

Saul asserts that the evidence was insufficient to support his conviction on count 1 for conspiracy to commit murder in the Lucio Amparo incident. "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing

24

court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 715, italics omitted.)

"One who conspires with others to commit a felony is guilty as a principal. (§ 31.) '"Each member of the conspiracy is liable for the acts of any of the others in carrying out the common purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." [Citations.]' [Citation]." (*In re Hardy* (2007) 41 Cal.4th 977, 1025-1026.) A conspiracy conviction requires proof that the defendant and one or more other persons had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, and proof of the commission of an overt act by one or more of the parties to the agreement in furtherance of the conspiracy. (*People v. Smith* (2014) 60 Cal.4th 603, 616.) The elements of conspiracy may be proven with circumstantial evidence. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024 (*Vu*).)

Saul contends that there was no evidence that he had the intent to conspire or the intent to commit murder. "Because there rarely is direct evidence of a defendant's intent, '[s]uch intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' [Citation.]" (*Vu*, *supra*, 143 Cal.App.4th at p. 1025.) We conclude that the evidence was sufficient to support Saul's conviction on count 1.

The first evidence of the conspiracy was a telephone call on December 13, 2006, in which Pasqual asked Roman where to find a gun because he had seen one or more rival gang members near his school. When Roman said that he had the gun, Pasqual directed him to bring it quickly to him at his home. In response to this intercepted call, law enforcement officers traveled to the area, disrupting the planned transfer. Shortly thereafter, Roman called Pasqual to say that he was still at home because the police were nearby, frustrating Pasqual because a rival gang member was "set up in target." Although Saul was not a speaker during these calls, his later conduct and statements permitted the jury reasonably to infer that at some point Pasqual or Roman apprised Saul of the situation and that he was part of the plan.

On December 15, 2006, at 9:35 p.m., Roman said he was with Pasqual and Saul, and told an unidentified person to call if he saw any suspicious cars. At 10:04 p.m., Pasqual told Roman he had spotted a rival gang member who was "slipping," or not paying attention to his surroundings, and that he was a potential target as long as Roman did not mind shooting a woman too. The next minute, Pasqual directed Roman where to find the target, again noting that he would need to "not mind shooting" a woman. Saul, Pasqual, and Roman had difficulty putting their plan together. They discussed the exact location of the targeted rival gang member on the specified street, with Pasqual describing to an inquiring Saul and Roman where to find him. Saul asked whether the target was in the middle of the block. Eventually, one of the three said to come back because they were making things too complicated.

At 10:07 p.m., Saul and Silva spoke, and Silva gave Saul directions similar to those that Pasqual had previously given to the location of the rival gang member. Silva told Saul that the target would be on the right-hand side of the street "two houses down[,] he's right there outside with a hyna[,] fool." Silva assured Saul that "everything" was "quiet," and that they would not know what was coming. Silva told Saul that he was in the area already and that Saul should tell him "if you guys are going . . . that way I [can] get behind you guys." Saul, apparently uncertain as to the directions, instructed Silva to "come back" to "explain better." Silva responded, "You ain't gonna do it, huh[?] [All ]right, fuck it[,] don't do it then[,] man, fuck it then." Saul answered, "Just come over here[,] fool[,] so we can do [it]." Within approximately one hour, Roman shot Amparo.

These recorded conversations provided substantial evidence showing Saul had the intent to agree or conspire, and the intent to carry out the murder of a rival gang member. Although Saul did not participate in the initial discussions of guns and rivals, he actively participated in the attempt to locate the targeted gang member on the night of the shooting, and the jury could reasonably infer from Saul's active involvement and his relationship with the other participants that he had agreed with the others to conspire to commit murder and that he had the specific intent to commit murder. "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the

26

parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation]." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.) Saul argues that his conversation with Silva shows that he was not in agreement with the plan to shoot the rival gang member and his female companion and that he lacked the necessary intent to support a conspiracy conviction. This claim of disagreement is belied by Saul's final exhortation to Silva to come over "so we can do [it]." Moreover, the jury could consider the completed shooting as evidence that Saul had entered into a conspiracy to commit the crime. (See *Vu*, *supra*, 143 Cal.App.4th at pp. 1024-1025.)

### B. Count 11, Conspiracy to Commit Murder

Pasqual was convicted of conspiracy to commit murder in the Ladybug incident. He argues that the People failed to prove that he had entered into an agreement to kill anyone, and that the prosecution relied on the faulty assumption that because all the actors were gang members, their attempt to transport a gun meant that they intended to commit murder. Pasqual argues that inferences may not be based on suspicion and must be grounded in evidence rather than speculation. (*People v. Morris* (1988) 46 Cal.3d 1, 21, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.) He observes that mere association and suspicion of criminal conduct is not enough to establish a conspiracy and that there must be some evidence that the association is also a conspiracy. (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1221.)

The evidence was sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that Pasqual conspired to commit murder. On January 19, 2007, Saul, Roman, Anthony and Rene Rivera, Soltero, and Silva extensively discussed acquiring guns, ammunition, and a car to attack members of a rival gang. Silva and the Campos brothers were identified as possible transporters of Soltero's weapon. Anticipating that Pasqual and Silva were going to transfer a firearm, the police intervened; Pasqual fled

27

with a firearm. The next day, February 20, 2007, Pasqual said that the weapon he had possessed was the nine-millimeter handgun he had obtained from Soltero, and he stated that he had been about to get some ammunition and commit a shooting when the police appeared. A jury could reasonably conclude from this evidence that Pasqual participated in the conspiracy to commit murder.

## IV. Sentencing Issues

### A. Eighth Amendment

Saul and Pasqual argue that their sentences of 25 years to life in state prison constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The Eighth Amendment prohibits mandatory sentences of life without parole for juvenile offenders. (*Miller v. Alabama* (2012) ___ U.S. ___, 132 S.Ct. 2455, 2469 (*Miller*).) In *Miller*, the Supreme Court explained that imposing mandatory life sentences without parole on a juvenile offender "precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id*. at p. 2468.)

Based on *Miller*, *supra*, ___ U.S. ___, 132 S.Ct. 2455, the California Supreme Court has held that the Eighth Amendment also prohibits states from sentencing a juvenile convicted of a nonhomicide offense "to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy" and thus is the

functional equivalent of a life without parole sentence.  (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*.)  More recently, the California Supreme Court decided in *People v. Franklin* (May 26, 2016, S217699) 63 Cal.4th 261 (*Franklin*) that recent California laws affording earlier parole hearings to youth offenders mooted claims that their sentences violated *Miller* as functional equivalents of life sentences without parole.[6]

Saul and Pasqual were each convicted of two counts of conspiracy to commit murder, as well as other crimes.  Although the sentencing statutes would have permitted the trial court to sentence each defendant to two consecutive prison terms of 25 years to life, because both Saul and Pasqual were juveniles the trial court elected to impose all sentences concurrently so that each was sentenced to a total of 25 years to life in state prison.  The trial court selected concurrent sentencing because it believed that to impose a sentence of 50 years to life without the possibility of parole on these juvenile offenders would be the functional equivalent of imposing a life sentence without the possibility of parole.  As Saul and Pasqual were each sentenced to prison terms of 25 years to life, they will be entitled to consideration for parole long before the end of their natural life expectancy.  (§§ 3046 [general parole eligibility provisions for inmates serving life sentences], 3051, subd. (b)(3) [entitlement to youth offender parole hearing for offenders who were under the age of 23 years at the time of the offense and who are serving life terms of 25 or more years to life].)  Their sentences therefore, do not violate *Miller*, *supra*, ___ U.S. ___, 132 S.Ct. 2455 or *Caballero*, *supra*, 55 Cal.4th 262.

Saul and Pasqual do not contend that they were sentenced to life imprisonment without parole or its functional equivalent.  They argue, however, that the court erred when it sentenced them to concurrent 25-year-to-life sentences for the two counts of conspiracy to commit murder because the court failed to consider the special characteristics of juvenile offenders and to make an individualized assessment of the

---

**6**     The initial briefing in this case concluded prior to the issuance of the *Franklin* decision.  The parties submitted supplemental briefing on the impact of this decision on Saul and Pasqual's Eighth Amendment arguments.

appropriate punishment, taking into account their youth, immaturity, and impetuosity; their failure to appreciate risks and consequences; their family and home environment; the circumstances of the crime, including the extent of their participation and the way that familiar and peer pressures may have influenced them; the possibility that the juvenile could have been charged and convicted of lesser offenses if it were not for incompetencies associated with their youth; and the possibility of rehabilitation. They argue that sentencing them to 25 years to life in prison "without an exercise of the court's discretion through application of the *Miller* factors" violates the Eighth Amendment.

Unlike the trial court that was mandated by law to impose consecutive sentences in *Franklin*, *supra*, 63 Cal.4th at p. 272, here the court had some sentencing discretion. Although the Camposes were subject to a sentence of 50 years to life or more, based on the court's understanding of *Caballero*, *supra*, 55 Cal.4th 262 and the parties' arguments about the facts related to the defendants' youth, the court exercised its discretion to impose significantly lesser, though still lengthy, sentences here. In fact, Pasqual was sentenced to a shorter minimum term of imprisonment than his attorney had advocated: his attorney argued that Pasqual should be sentenced to 28 years, 4 months to life in state prison, but the court elected to sentence him to a total of 25 years to life. This record demonstrates that the court did in fact consider the Camposes' youth, and, implicitly, the special characteristics of juvenile offenders, in making its individualized determinations of the appropriate sentences for them.

Finally, in their supplemental briefing, Saul and Pasqual request that this court order further proceedings pursuant to *Franklin*, *supra*, 63 Cal.4th at pages 284-285. In *Franklin*, the California Supreme Court remanded the case to the trial court because it was not clear that the defendant had been afforded sufficient opportunity at sentencing to place on the record the type of mitigating evidence that would be useful to the parole board at his eventual youth offender hearing. (*Ibid*.) Pasqual asks that we remand the case for resentencing to the trial court with directions to determine whether he was afforded a sufficient opportunity to make a record of mitigating evidence tied to his youth

which could be relevant to his eventual parole consideration.[7] Saul asks for a remand so that he may make a record of such mitigating evidence for his future youth offender parole hearing.

Appellants present the question of whether juvenile offenders who are sentenced to a minimum term of imprisonment that falls substantially below their life expectancy and thus have not received a sentence functionally equivalent to life in prison without parole, but whose minimum terms are sufficiently lengthy that their parole hearings will not occur for many years, should be afforded the opportunity to place on the record evidence relevant to the parole board's eventual consideration under *Franklin*, *supra*, 63 Cal.4th 261. We need not resolve that question here, however, because it is clear from the record that the appellants, who were sentenced after the decisions in *Miller*, *supra*, ___ U.S. ___, 132 S.Ct. 2455 and *Caballero*, *supra*, 55 Cal.4th 262, were afforded the opportunity to present mitigating evidence at the sentencing hearing. At the start of the hearing, immediately after the defendants advised the court that there was no legal cause why judgment should not be pronounced, counsel for Pasqual told the court that he would like to present a statement to the court. The court responded, "Sure, absolutely," and a teacher who worked with incarcerated juveniles then described for the court her experiences with Pasqual. The teacher told the court she had worked with Pasqual on a weekly basis for seven years, and that he had transformed from a "cocky little boy hiding behind some kind of bravado" to a person who "showed his heart." She declared that she did not believe Pasqual was a monster or a person to be feared, and she told the court that he deserved a second chance. She talked about the trend toward re-evaluating juvenile sentencing and the evolving sense that children should be held to a different standard than adults, and she expressed a hope that changing sentencing laws would lead to Pasqual's release. She concluded, "Children are not adults. They are not to be held to the same

---

[7] Pasqual also asks that we modify the judgment to specify that he will be entitled to a parole hearing during his 25th year of incarceration, but this is unnecessary as section 3051 is in effect.

standard. I spent his 15th, 16th, 17th, and 18th birthday with him in jail. He is a child, not an adult[,] and should be held to a different standard." Pasqual's counsel did not seek to present further evidence, and Saul's attorney chose not to present mitigating evidence, but both attorneys expressly and successfully argued to the court that it should consider the defendants' youth at sentencing in light of *Caballero*. As the record does not demonstrate or suggest that the trial court placed limitations on the defendants' ability to present mitigating evidence, Saul and Pasqual have not established that they lacked the opportunity to present this evidence such that a remand would be warranted under *Franklin*.

### B.    Fines and Fees

In his opening brief, Saul alleged that the trial court made several errors with respect to the imposition of fines and fees at sentencing. In his reply brief, however, Saul acknowledged that the abstract of judgment properly reflects the total fines and fees that are authorized by law, and there appears to be no remaining dispute on this issue.

### C.    Custody Credit Calculations

As noted by both Saul and the Attorney General, Saul's presentence custody credits were incorrectly calculated. First, Saul was awarded 2,571 days of actual credit, although the records indicate that he served 2,604 days prior to sentencing.[8] Also, he received 385 days of conduct credits, but under section 2933.1, he was entitled to 390 days of conduct credits. We modify the judgment to reflect that Saul is awarded 2,994 days of presentence custody credits, of which 2,604 days reflect actual days served and 390 are conduct credits.

Pasqual, who joins in Saul's custody credits argument, also received an incorrect number of presentence custody credits. Pasqual and the Attorney General agree, as do we, that Pasqual should have been awarded 2,996 days of presentence custody credit, of

---

[8]    The parties calculate Saul's actual days of credit at 2,603 days based on an arrest date of September 9, 2007, but Saul's probation report states that he was arrested on September 8, 2007.

which 2,606 are actual custody credits and 390 are conduct credits (§ 2933.1). We modify the judgment accordingly.

### V.    Abstract of Judgment

In our review of this matter, we observed a discrepancy between the oral record of the sentencing hearing and Pasqual's abstract of judgment with respect to count 5, assault with a deadly weapon, and its associated sentencing enhancement pursuant to section 186.22. At the sentencing hearing the court sentenced Pasqual to the upper term sentence of nine years for the offense, to be served concurrently with his 25-years-to-life sentence on count 1; and the midterm of three years for the sentence enhancement. Pasqual's abstract of judgment, however, states that the sentence for count 5 and its associated enhancement were stayed under section 654. Where there is a discrepancy between the court's oral pronouncement and the minute order or abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The superior court is directed to prepare a corrected abstract of judgment for Pasqual reflecting the correct sentence on count 5.

### DISPOSITION

With respect to appellant Saul Campos, the judgment is modified to reflect 2,604 days of actual custody credits in addition to presentence credits in the amount of 390 days, for a total of 2,994 days of presentence custody credits. The superior court is directed to prepare a corrected abstract of judgment for Saul Campos that reflects the 2,994 days of presentence custody credits, and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

With respect to appellant Pasqual Campos, the judgment is modified to reflect 2,606 days of actual custody credits in addition to presentence credits in the amount of 390 days, for a total of 2,996 days of presentence custody credits. The superior court is directed to prepare a corrected abstract of judgment for Pasqual Campos reflecting that (1) his sentence on count 5 was the upper term of 9 years, to be served concurrently, with an associated sentence enhancement of 3 years, also concurrent; and (2) his presentence

custody credits total 2,996 days; and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgments are affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.


BLUMENFELD, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.